**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2108

WORLDWIDE NETWORK SERVICES, LLC; WORLDWIDE NETWORK SERVICES,
INTERNATIONAL, FZCO,

Plaintiffs - Appellees,

v.

DYNCORP INTERNATIONAL, LLC,

Defendant – Appellant.

-------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amicus Supporting Appellant,

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW; THE NATIONAL
URBAN LEAGUE,

Amici Supporting Appellees.

No. 08-2166

WORLDWIDE NETWORK SERVICES, LLC; WORLDWIDE NETWORK SERVICES,
INTERNATIONAL, FZCO,

Plaintiffs - Appellants,

v.

DYNCORP INTERNATIONAL, LLC,

Defendant – Appellee.

--------------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amicus Supporting Appellee,

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW; THE NATIONAL
URBAN LEAGUE,

Amici Supporting Appellants.

------------------------

Appeals from the United States District Court for the Eastern
District of Virginia, at Alexandria.  Gerald Bruce Lee, District
Judge.  (1:07-cv-00627-GBL-JFA)

------------------------

Argued:  September 22, 2009          Decided:  February 12, 2010

------------------------

Before NIEMEYER and DUNCAN, Circuit Judges, and James P. JONES,
Chief United States District Judge for the Western District of
Virginia, sitting by designation

------------------------

Affirmed in part and reversed in part by unpublished opinion.
Judge Duncan wrote the majority opinion, in which Judge Niemeyer
concurred as to Part II.D(1)&(2), and in which Judge Jones
concurred as to Parts II.A, II.B, and II.C.  Judge Niemeyer
wrote a separate opinion concurring in part and dissenting in
part.  Judge Jones wrote a separate opinion concurring in part
and dissenting in part.

------------------------

**ARGUED:** Carter Glasgow Phillips, SIDLEY & AUSTIN, LLP,
Washington, D.C., for Dyncorp International, LLC.  Patricia Ann
Millett, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, Washington,
D.C., for Worldwide Network Services, LLC, and Worldwide Network
Services, International, FZCO.  **ON BRIEF:** Eric D. McArthur,
SIDLEY & AUSTIN, LLP, Washington, D.C.; George D. Ruttinger,
Keith J. Harrison, Clifton S. Elgarten, CROWELL & MORING, LLP,
Washington, D.C., for Dyncorp International, LLC.  Thomas P.
Goldstein, Anthony T. Pierce, Michele A. Roberts, Merrill C.
Godfrey, Monica P. Sekhon, Won S. Shin, Michael S. Bailey, AKIN,
GUMP, STRAUSS, HAUER & FELD, LLP, Washington, D.C., for
Worldwide Network Services, LLC, and Worldwide Network Services,

2

International, FZCO. Charles P. Roberts, III, CONSTAGY, BROOKS & SMITH, LLP, Winston-Salem, North Carolina; Robin S. Conrad, Shane B. Kawka, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C., for Chamber of Commerce of the United States of America, Amicus Supporting Dyncorp International, LLC. Bernard J. DiMuro, Jonathan R. Mook, Michael E. Barnsback, DIMURO GINSBERG, PC, Alexandria, Virginia; John Brittain, Sarah Crawford, Tricia Jefferson, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., for Lawyers' Committee for Civil Rights Under Law, Amicus Supporting Worldwide Network Services, LLC, and Worldwide Network Services, International, FZCO. Sean A. Lev, Priya R. Aiyar, Kfir B. Levy, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., for The National Urban League, Amicus Supporting Worldwide Network Services, LLC, and Worldwide Network Services, International, FZCO.

---

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Worldwide Network Services, Inc. ("WWNS") sued DynCorp International, LLC ("DynCorp") for discrimination under 42 U.S.C. § 1981 and various torts after DynCorp terminated a subcontract with WWNS related to government work in Iraq and Afghanistan. Upon finding DynCorp liable, a jury awarded WWNS $10 million in punitive damages. On appeal, DynCorp challenges three evidentiary rulings, two jury instructions, and the district court's denial of DynCorp's motions under Federal Rule of Civil Procedure 50. For the reasons stated below, we affirm in part and reverse in part, vacating the award of punitive damages.

I.

A.

DynCorp contracted with the United States Department of State to provide services in Iraq and Afghanistan for the Worldwide Personal Protective Services program ("WPPS") and Civilian Police program ("CivPol"). WPPS protects United States personnel and certain foreign officials abroad. CivPol provides law enforcement, criminal justice, and other assistance to societies undergoing post-conflict reconstruction. DynCorp carried out the services through its International Technical

4

Services Division ("ITS Division"). The CivPol Program Manager was Richard Cashon.

In February 2004 DynCorp entered into subcontracts with WWNS to provide communication and information-technology services for WPPS and CivPol ("WPPS Subcontract" and "CivPol Subcontract"). DynCorp then issued task orders that would expire between August and October 2006.[1] WWNS had been designated a Small Disadvantaged Business by the United States Small Business Administration under the Small Business Act of 1953 § 8(a), 15 U.S.C. § 637(a), because its owners Walter Gray and Reginald Bailey are African American. WWNS was awarded the WPPS and CivPol Subcontracts after well-known entrepreneur Ross Perot introduced Gray and Bailey to Steven Cannon, who was then President and CEO of DynCorp.

B.

The quality of WWNS's work remains unclear. In January 2006 the State Department twice complained about WWNS and threatened to terminate DynCorp as a result. One complaint

---

[1] Regarding "task orders," see 48 C.F.R. § 16.501-1 ("Task order contract means a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract.").

5

stated, "WWNS's technical performance has in general been inadequate to the point where it has disrupted critical communications in the field." J.A. 117. Also, DynCorp had previously complained to WWNS about radio failures. Notwithstanding, Cashon gave WWNS glowing evaluations in January and March 2006. His March evaluation deemed WWNS "excellent" or "good" in every category and stated that DynCorp would hire WWNS again.

After receiving the State Department complaints, DynCorp investigated WWNS's work and generated two internal reports. First, the CivPol Iraq IT Evaluation ("Iraq Report") completed by June 19, 2006, evaluated WWNS's work at the Baghdad Hotel, the CivPol headquarters for Iraq. Second, the Middle East Information Technology Tiger Team Site Assessment Report ("Tiger Report") dated July 22, 2006, evaluated WWNS's work at locations in Afghanistan. The reports' principal author was Christopher Kellogg ("Kellogg"), but other DynCorp employees also contributed. Each report was highly critical of WWNS.

C.

DynCorp's relationship with WWNS began to deteriorate in December 2005 when DynCorp hired new executives in the ITS Division. Robert Rosenkranz became President, Richard Walsh became Vice-President of Operations, Walter Merrick became

6

Deputy CivPol Program Manager, and Leon DeBeer became Information-Technology Manager. With these arrivals, DynCorp began excluding WWNS personnel from planning meetings, ignoring emails from WWNS managers in Iraq, and failing to provide WWNS employees with needed access to worksites and equipment. In particular, DynCorp failed to provide WWNS employees with security badges needed to move around in Iraq.

The tension between DynCorp and WWNS reached breaking point in summer 2006. On July 17, 2006, Cannon resigned as President and CEO of DynCorp. Immediately thereafter, DynCorp decided not to issue further task orders under the CivPol Subcontract or to renew the subcontract. DynCorp alleges that Cashon was solely responsible for this decision. Cashon's testimony and other evidence, however, indicate that Cashon, Rosenkranz, Merrick, and Walsh made the decision collectively.

Prior to the CivPol Subcontract's expiration, DynCorp engaged in certain questionable behavior toward WWNS. For example, DynCorp had Charles Jones, WWNS's Iraq Country Manager, escorted from his workplace at gunpoint. DynCorp then recruited WWNS's non-managerial employees in Iraq and Afghanistan to join DynCorp or EDO Corporation ("EDO Corp"), the non-minority-owned company that would eventually replace WWNS. Moreover, Walsh directed DynCorp's accounting department to stop processing or

7

paying invoices from WWNS for work already completed.[2]    In stopping payment, DynCorp did not provide WWNS with notice or the opportunity to cure alleged deficiencies in the work. Because almost all of WWNS's business came from DynCorp, DynCorp's actions in ending the CivPol Subcontract, recruiting WWNS's employees, and stopping payment on its invoices nearly destroyed WWNS.

## D.

Beyond the above questionable behavior, the record contains evidence of DynCorp's racial animus toward WWNS.    John Mack, a consultant for DynCorp, testified that Walsh called Gray "a stupid black mother . . . ."    J.A. 1723.    Also, Rosenkranz terminated DynCorp's only minority executive Richard Spencer, a Latino, who testified to "some underlying discriminatory things" behind his termination.  J.A. 1019.

DeBeer in particular expressed racial animus, often calling Gray "nigger" and "kaffir."[3]    J.A. 872.    According to Jones, DeBeer expressed "[t]wo to three times a week" that "people of

---

[2] In February 2008 DynCorp paid WWNS over $3.3 million for outstanding invoices that dated back two years.  It offered no explanation for the delay.

[3] The term "kaffir" is "[u]sed especially in southern Africa as a disparaging term for a Black person."  American Heritage Dictionary of the English Language 952 (4th ed. 2006).

8

Anglo descent . . . had made a grave error" because they "had taken the black man as a youth and attempted to clothe him and send him to school" and that "the proper role of the black man was to go out and kill a lion, proving his manhood, at which point in time he should be put to work to feed his family . . . and mated with a woman so that he would have more children, who could then be put to work feeding their family."  J.A. 874. Jones said DeBeer predicted that DynCorp's relationship with WWNS would end and explained that "that ending was being manufactured by . . . factions within DynCorp" that opposed Cannon.  J.A. 869.  Jones noted that DeBeer was "consumed by . . . hatred" for "Cannon and everybody associated with him." J.A. 873.

Finally, DynCorp celebrated WWNS's demise during a company dinner in October 2006 hosted by Rosenkranz.  At the dinner, Walsh received a T-shirt that read, "WWNS - I took them down, and all I got was this lousy T-Shirt."  J.A. 1139.  After Walsh put on the T-shirt, DynCorp employee Bill Cavanaugh presented a letter purportedly from Gray to Walsh and read it aloud in mock Ebonics.  According to a DynCorp executive, Rosenkranz "was laughing his ass off."  J.A. 1029.

In October 2006 WWNS brought this action against DynCorp and EDO Corp in the District of Columbia. The case was later transferred to the Eastern District of Virginia. The complaint asserted claims of discrimination under 42 U.S.C. § 1981 (Count 1); tortious interference with contract (Count 3); tortious interference with prospective economic advantage (Count 4); civil conspiracy (Count 5); conspiracy under the Virginia Conspiracy Act, Va. Code Ann. § 18.2-499 (Count 6); breach of the CivPol Subcontract (Count 7); breach of the WPPS Subcontract (Count 8); and breach of the implied covenant of good faith and fair dealing (Count 9).[4] In turn, DynCorp filed counterclaims of breach of the CivPol Subcontract, breach of the WPPS Subcontract, and breach of warranty. WWNS and DynCorp proceeded to trial by jury in May 2008. WWNS and EDO Corp settled on the eve of trial.

Before trial, DynCorp planned to introduce the Iraq and Tiger Reports into evidence through Kellogg, who would testify about his observations during DynCorp's internal investigation. However, the district court granted WWNS's motion to exclude the testimony, saying the reports contained hearsay. The court also found the reports and Kellogg's proposed testimony inadmissible

---

[4] Count 2 was dismissed before trial.

under Federal Rule of Evidence 701, which prohibits lay witnesses from giving expert testimony.

During trial, DynCorp objected to Spencer's testimony about his termination by Rosenkranz based on Federal Rules of Evidence 401 and 403.[5] The district court overruled this objection, reasoning that Spencer's testimony was "relevant to the issue of pretext as it demonstrates DynCorp's corporate attitude toward minorities and provides insight into what factors contributed to DynCorp's decision to terminate its relationship with WWNS." J.A. 1891. Later, DynCorp tried to offer rehabilitative testimony from Jasbir Gill, a Sikh employee at DynCorp. The court held, "Well, I'll allow Ms. Gill to testify about her interaction with Mr. DeBeer, and whether or not he used any racial slurs in her presence," but "[h]ow she was treated by the company is irrelevant." J.A. 1568.

Finally, DynCorp objected to the testimony of John Mack. When WWNS called him on rebuttal, Mack testified that Walsh called Gray "a stupid black mother . . . ." J.A. 1723. About

---

[5] Rule 401 defines "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed. R. Evid. 401. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

ten questions later, DynCorp objected and moved to strike because WWNS had failed to notify DynCorp about Mack's testimony under Federal Rule of Civil Procedure 26(e), which requires parties to supplement discovery when new evidence surfaces. During a bench conference, WWNS admitted its failure to notify DynCorp pursuant to Rule 26(e). Nonetheless, the court denied DynCorp's motion to strike and instead instructed the jury to take into consideration WWNS's failure to notify DynCorp about Mack's testimony.

Following the close of evidence, the district court granted WWNS's motion under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law regarding unpaid invoices totaling almost $2.8 million. The court then instructed the jury.

Regarding the § 1981 discrimination claim, DynCorp had requested an instruction based on Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277 (4th Cir. 2004). The proposed instruction stated:

> DynCorp asserts that the person who made the decision not to renew or extend the WWNS CIVPOL subcontract or task orders was not improperly motivated by discrimination. To the extent that WWNS rests its discrimination claim upon the discriminatory motivations of a subordinate employee, WWNS must show by the greater weight of the evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for DynCorp.

J.A. 1185. The district court refused to give this instruction,

12

explaining: "I don't think I need to.  I think you can prove that they [DynCorp] were responsible or not, and the jury doesn't have to specify which person did what."  J.A. 1656. Instead, the court instructed: "WWNS must prove that DynCorp intentionally discriminated against WWNS.  That is, the race of WWNS's owners must be proven to have been a motivating factor in DynCorp's decision not to renew WWNS's CIVPOL subcontract or issue further task orders thereunder."  J.A. 1762.

Regarding punitive damages, the district court gave the following instruction:

> [Y]ou may award punitive damages if WWNS . . . [has] shown by clear and convincing evidence that DynCorp maliciously, or with reckless indifference, discriminated against WWNS, and/or that DynCorp tortiously interfered with the contracts between [WWNS] and its employees, and/or conspired with EDO to interfere with the contracts between [WWNS] and its employees, and/or that DynCorp tortiously interfered with WWNS's prospective economic advantage.

J.A. 1771.  By contrast, DynCorp had requested an instruction that began, "WWNS claims the acts of DynCorp were done with malice or reckless indifference to WWNS's federally protected rights."  J.A. 1186 (emphasis added).

After several days of deliberation, the jury returned a split verdict.  It found in DynCorp's favor on Counts 4-6 and one of DynCorp's counterclaims, awarding DynCorp $178,000 for breach of the WPPS Subcontract.  The jury found in WWNS's favor on all other claims.  It awarded WWNS compensatory damages of

13

$3.42 million for Count 1 (§ 1981 discrimination), $83,000 for Count 3 (tortious interference with contract), $558,510.42 for Count 7 (breach of CivPol Subcontract), $42,092.62 for Count 8 (breach of WPPS Subcontract), and $720,000 for Count 9 (breach of implied covenant of good faith and fair dealing). The jury also awarded WWNS $10 million in punitive damages.

The district court denied DynCorp's renewed Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law, Rule 59(a) motion for a new trial, and Rule 59(e) motion to alter or amend the judgment. This appeal followed. We have jurisdiction under 28 U.S.C. §§ 1331 and 1291.[6]

## II.

On appeal, DynCorp asserts (1) that the district court should have given DynCorp's proposed jury instruction regarding the § 1981 discrimination claim; (2) that DynCorp should have been awarded judgment as a matter of law on that claim; (3) that Kellogg's testimony and the Iraq and Tiger Reports should have been admitted; (4) that Spencer's testimony should have been excluded; (5) that Mack's testimony should have been struck;

---

[6] WWNS filed a cross-appeal, arguing that Alexis Maniatis's proposed testimony calculating WWNS's lost profits was erroneously excluded. Because we do not remand for another trial to determine compensatory damages, we do not reach WWNS's cross-appeal.

14

(6) that the jury instruction on punitive damages for § 1981 discrimination was erroneous; and (7) that the record does not support punitive damages for § 1981 discrimination.[7] We consider each contention below.

## A.

We first consider DynCorp's challenge to the district court's failure to give its proposed jury instruction regarding the § 1981 discrimination claim. "A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009) (internal quotations omitted). "We review the district court's decision to give or refuse to give a jury instruction for abuse of discretion." Id. "Moreover, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context

_____

[7] DynCorp also asserts that the award of punitive damages violates the Due Process Clause, but we do not reach this issue because we vacate that award.

15

of the entire charge, the instructions accurately and fairly state the controlling law." Id. (internal quotations omitted).

Because DynCorp's proposed instruction regarding the § 1981 claim was based on Hill, in reviewing the district court's failure to give that instruction we must consider Hill's applicability to this case. Ethel Hill was a Lockheed mechanic who repaired aircraft at military bases under contracts between Lockheed and the United States. Her work was overseen by a "lead person" who reported to her supervisor. Lockheed also assigned a safety inspector to each jobsite who reported to the lead person but lacked supervisory authority. Hill received three written reprimands based on errors discovered by her jobsite's safety inspector and was terminated pursuant to company policy. Hill alleged discrimination by that inspector, who had often called her a "damn woman" and "useless old lady" who should retire. Hill, 354 F.3d at 283.

Hill sued Lockheed under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("ADEA"), arguing that but for the inspector's discrimination she would have received fewer reprimands and avoided termination. The district court granted summary judgment to Lockheed on the ground that the inspector's bias could not be imputed to Lockheed. Hill, 354 F.3d at 283. In affirming, we announced this rule:

16

> [T]o survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon <u>the discriminatory motivations of a subordinate employee</u> must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.

<u>Id.</u> at 291 (emphasis added). Accordingly, we found summary judgment appropriate because Hill had not shown evidence that the safety inspector could be considered the actual decisionmaker or the one principally responsible for the decision to terminate Hill. <u>Id.</u> at 297-98.

DynCorp argues that the <u>Hill</u> rule governs the case now before us. After carefully studying <u>Hill</u>, we disagree. In that case, the ultimate question was whether Lockheed intentionally discriminated in deciding to terminate Hill. This required evidence that her "'protected trait . . . actually motivated the employer's decision,'" that is, that the trait "'actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" <u>Id.</u> at 286 (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 141 (2000)). Accordingly, we considered "who is a 'decisionmaker' for purposes of discrimination actions brought under Title VII and the ADEA." <u>Hill</u>, 354 F.3d at 286. We said agency principles guided our decision because both statutes defined "employer" to include "any agent" thereof. <u>Id.</u> at 287; <u>see also</u>

17

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754-65 (1998). We then noted Ellerth, where the Supreme Court explained that "[t]he supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control," and that "tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Id. at 762. Therefore, the Court said that "a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." Id.

The case most important to our Hill decision was Reeves. Roger Reeves supervised assembly-line workers for Sanderson Plumbing Products, Inc., which made toilet seats and covers. Upon learning that Reeves made various mistakes, Powe Chestnut, the director of manufacturing and the husband of company president Sandra Sanderson, told Sanderson that Reeves should be fired. Sanderson followed his recommendation. Reeves then sued under the ADEA, alleging that his termination resulted from discrimination by Chestnut, who had often showed discriminatory animus toward him. Reeves, 530 U.S. at 138. The Supreme Court found that Reeves had overcome judgment notwithstanding the verdict because, although Sanderson "made the formal decision to discharge" Reeves, Chestnut "was principally responsible for" and "the actual decisionmaker behind his firing." Id. at 151-

18

Reeves had produced evidence that Chestnut "exercised 'absolute power' within the company." Id. at 152.

Ultimately, Reeves's rationale dictated the rule that Hill announced. See Hill, 354 F.3d at 288-89 ("Reeves informs us that the person allegedly acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action, so long as . . . the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action." (quoting Reeves, 530 U.S. at 151-52)). For our purposes, Reeves also clarifies the Hill rule. Reeves distinguishes between the "formal decisionmaker," which under Ellerth would be the person authorized to make the relevant decision, and "subordinate" employees who lack this authority, such as Chestnut or the safety inspector in Hill. Accordingly, we believe the term "subordinate employee" in the Hill rule invokes that distinction. Hill, 354 F.3d at 291.

Using this interpretation, and assuming for purposes of this appeal that Hill applies under § 1981, we conclude that DynCorp can take no comfort from Hill on the facts before us. DynCorp relies on Hill to argue that, because it alleges that Cashon was solely responsible for the decision to terminate the CivPol Subcontract, the jury should not have been allowed to consider the racial animus of anyone other than Cashon. We

19

note, however, that Hill does not enable DynCorp to self-select the decisionmaker whose motives are the purest. Furthermore, we find Hill inapplicable for two separate reasons.

First, the Hill rule's initial premise, namely, that the plaintiff "rests a discrimination claim . . . upon the discriminatory motivations of a subordinate employee," assumes that a formal decisionmaker can be identified. Id. at 291. In this case, however, WWNS and DynCorp offered conflicting evidence regarding who had authority to terminate the CivPol Subcontract. Cashon testified to having this authority but also admitted that he answered to Rosenkranz regarding his decision. Moreover, other evidence indicated that Cashon, Merrick, Rosenkranz, and Walsh were authorized to make that decision collectively. Significantly, Walsh was the one who directed DynCorp's accounting department to stop payment to WWNS for completed work. By contrast, this problem of identification was absent from Hill and Reeves, where none debated who had formal decisionmaking authority.

Second, even assuming that only Cashon could be considered the formal decisionmaker, we are unwilling to conclude that Walsh and Rosenkranz, who supervised Cashon, should be treated like the Hill and Reeves subordinate employees who lacked authority over the formal decisionmaker. Because Hill thus does not apply to this case, we conclude that the district court's

20

refusal to give DynCorp's proposed instruction was not an abuse of discretion.[8]

## B.

Next, we consider DynCorp's challenge to the district court's denial of DynCorp's renewed Rule 50(b) motion for judgment as a matter of law on the § 1981 claim. "We review de novo the grant or denial of a motion for judgment as a matter of law." Robinson v. Equifax Info. Servs, LLC, 560 F.3d 235, 240 (4th Cir. 2009) (internal quotations omitted). "Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." U.S. ex rel. DRC, Inc. v. Custer Battles, LLC, 562 F.3d 295, 305 (4th Cir. 2009) (internal quotations omitted); see also Saunders v. Branch Banking & Trust

---

[8] We note as well that DynCorp's proposed jury instruction was "substantially covered by the court's charge to the jury." Passaro, 577 F.3d at 221. As mentioned, the district court instructed that "the race of WWNS's owners must be proven to have been a motivating factor in DynCorp's decision not to renew WWNS's CIVPOL subcontract or issue further task orders thereunder." J.A. 1762. Following this instruction's clear import, the jury could not have considered evidence of racial bias regarding DynCorp employees that neither made nor had authority to make that decision. Thus, DynCorp's proposed instruction differed from the actual one only by wrongly insinuating that just one person could have made or been responsible for the decision to terminate the CivPol Subcontract.

21

Co. of Va., 526 F.3d 142, 147 (4th Cir. 2008) ("A court may award judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party."). On this issue, we must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002).

In this case, § 1981 liability required proof that race actually motivated DynCorp's decision to terminate the CivPol Subcontract, that is, that race "actually played a role in the . . . decisionmaking process and had a determinative influence on the outcome." Reeves, 530 U.S. at 141. DynCorp alleges that only Cashon made the decision to terminate the CivPol Subcontract. Accordingly, DynCorp concludes that all other DynCorp executives' alleged racial animus must be ignored under Hill. In that light, DynCorp asserts that the verdict cannot stand. We disagree with the initial premise that only Cashon made the decision.[9] The record contains sufficient evidence from

---

[9] We do not dispute the characterization in Judge Niemeyer's opinion, dissenting in part, that Cashon had authority to terminate the CivPol Subcontract. However, that opinion fails to reckon with Cashon's own testimony that he made the decision collectively with Merrick, Rosenkranz, and Walsh — the discriminatory animus of at least Rosenkranz and Walsh having been set out.

22

which a reasonable jury could conclude that Cashon, Rosenkranz, Merrick, and Walsh made a collective decision to terminate the CivPol Subcontract. The record also contains evidence that Rosenkranz and Walsh harbored racial animus against Gray and Bailey. This evidence includes Walsh's racial slur, Spencer's termination by Rosenkranz, Walsh stopping payments to WWNS, and the checkered October 2006 dinner celebrating WWNS's misfortune.[10] Therefore, sufficient evidence of discrimination was presented for § 1981 liability.

Moreover, we note that WWNS presented adequate evidence to establish § 1981 liability through the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (extending McDonnell Douglas to § 1981 cases), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. Under this analysis, the plaintiff carries an initial burden to establish a prima facie case of discrimination. A company alleging discriminatory contract termination may carry this burden by showing that (1) the defendant terminated a contract with it, (2) it was

---

[10] To the extent that Judge Niemeyer's opinion argues that, but for evidence about DeBeer, the record contained insufficient evidence to establish § 1981 discrimination, we note that that opinion fails to account for Walsh's otherwise unexplained decision to stop payments to WWNS.

23

within a protected class, (3) its performance under the contract met the defendant's legitimate expectations, and (4) the defendant instead contracted with a company not in a protected class. See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). Once the prima facie case has been established, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the contract termination. Id. (internal quotations omitted). Once the defendant carries this burden of production, the burden shifts back to the plaintiff to prove that the defendant's stated reasons "were not its true reasons, but were a pretext for discrimination." Id. (internal quotations omitted). At this point, "the McDonnell Douglas framework — with its presumptions and burdens — disappear[s] . . . and the sole remaining issue [i]s discrimination vel non." Reeves, 530 U.S. at 142-43 (internal quotations omitted).

WWNS established a prima facie case of discrimination by showing that (1) DynCorp terminated the CivPol Subcontract, (2) WWNS had been designated a Small Disadvantaged Business by the SBA because Gray and Bailey are African American, (3) Cashon's glowing evaluations of WWNS in January and March 2006 rated WWNS "excellent" or "good" across the board and stated that DynCorp would hire WWNS again, and (4) EDO Corp. was not minority-owned. In turn, DynCorp articulated a legitimate,

24

nondiscriminatory reason for terminating the CivPol Subcontract. Cashon testified that the reason was WWNS's poor performance. We believe a reasonable jury could have concluded that DynCorp's stated reason was merely a pretext for discrimination. For example, the jury might have disbelieved Cashon's testimony about DynCorp's stated reason because Cashon himself had given WWNS glowing evaluations. Therefore, we affirm the district court's denial of DynCorp's Rule 50(b) motion regarding the § 1981 claim.

## C.

We next consider three evidentiary rulings that DynCorp challenges. We review each for abuse of discretion. United States v. Basham, 561 F.3d 302, 325 (4th Cir. 2009).

## 1.

First, DynCorp argues that the district court committed reversible error by excluding Kellogg's testimony and the Iraq and Tiger Reports. This evidence was excluded under Federal Rule of Evidence 701, which "forbids the admission of expert testimony dressed in lay witness clothing." United States v. Perkins, 470 F.3d 150, 156 (4th Cir. 2006). Kellogg's excluded testimony and the Iraq and Tiger Reports were technical evaluations of WWNS's performance. Discussed topics include

25

whether WWNS's chosen method of encrypting wireless communication provided enough security. We believe such matters are well beyond the scope of permissible lay testimony under Rule 701. See Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000) (noting that Rule 701 "generally does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness" (internal quotations omitted)). Therefore, we conclude that the district court's decision to exclude that evidence was not an abuse of discretion.

2.

Second, DynCorp challenges the district court's failure to exclude Spencer's testimony about his termination by Rosenkranz under Federal Rules of Evidence 401 and 403. The court below reasoned that Spencer's testimony was "relevant to the issue of pretext as it demonstrates DynCorp's corporate attitude toward minorities and provides insight into what factors contributed to DynCorp's decision to terminate its relationship with WWNS." J.A. 1891. We believe that Spencer's testimony was indeed relevant because of Rosenkranz's apparent participation in DynCorp's decision to terminate the CivPol Subcontract. Moreover, we believe this probative value outweighed any danger

26

of undue prejudice. Thus, we affirm the district court's decision to allow Spencer's testimony.

3.

Finally, DynCorp challenges the district court's failure to strike Mack's testimony that Walsh called Gray "a stupid black mother . . . ." J.A. 1723. Federal Rule of Civil Procedure 26(e) provides that a party who has made a disclosure or responded to an interrogatory "must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). Mack's allegation became known to WWNS several days before trial, but DynCorp was not made aware of it until Mack testified at trial. WWNS thus clearly violated Rule 26(e), which it does not dispute.

Upon discovering that WWNS had not disclosed Mack's allegation, DynCorp objected and moved to strike because of WWNS's Rule 26(e) violation. The district court denied this motion, stating: "[T]he difficulty that I have is, you're asking me to tell the jury to disregard the hot poker that has just been put in front of their face. I don't think I can undo it that way." J.A. 1730. Instead, the court instructed the jury to take into consideration WWNS's failure to notify DynCorp

27

about Mack's allegation. DynCorp later moved for a new trial, arguing that Mack's testimony should have been struck, but the court denied this motion.

Federal Rule of Civil Procedure 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). WWNS asserts that the Rule 26 violation was harmless but concedes that no substantial justification existed.

We have said that a court determining harmlessness under Rule 37(c)(1) should consider five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). Based on these factors, we believe WWNS's Rule 26 violation was indeed harmless. Although DynCorp was surprised by Mack's testimony, the trial continued undisturbed. Moreover, the record contains abundant evidence of racial animus aside from Mack's testimony. This includes Spencer's termination by Rosenkranz, the racially charged

28

October 2006 dinner celebrating WWNS's misfortune, and Walsh directing DynCorp's accounting department to stop paying WWNS for work already completed.  We therefore decline to reverse on this ground.

## D.

Finally, we consider alleged errors regarding the $10 million punitive-damages award.  DynCorp argues that punitive damages for the § 1981 claim are unsupported by the record and that the jury instruction on that issue was erroneous.

### 1.

We begin by considering the district court's denial of DynCorp's renewed Rule 50(b) motion for judgment as a matter of law with regard to WWNS's prayer for punitive damages for the § 1981 claim.  We review this decision de novo.  Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 442-43 (4th Cir. 2000).

A plaintiff who prevails under § 1981 "is entitled under the common law to punitive damages . . . for conduct . . . exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right."  Id. at 441 (internal quotations omitted).  The Supreme Court developed this standard in Smith v. Wade, 461 U.S. 30 (1983), for actions under

29

42 U.S.C. § 1983. Congress later adopted the standard in the Civil Rights Act of 1991, which allows punitive damages in Title VII actions where the employer discriminated "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Interpreting this statute, the Supreme Court held that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999). Accordingly, the Court held that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Id. at 536. Because § 1981a was intended to mirror Smith, we have held that "any case law construing the punitive damages standard set forth in § 1981a, for example Kolstad, is equally applicable to clarify the common law punitive damages standard with respect to a § 1981 claim." Lowery, 206 F.3d at 441. Therefore, upon reviewing § 1981 punitive damages, we have required evidence that the defendant acted "in the face of a perceived risk that [its] decision would violate federal law." Id. at 443.

Regarding this requirement, Kolstad noted hypotheticals that are particularly relevant to the case before us. The Supreme Court explained:

> There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized.

Kolstad, 527 U.S. at 536-37. Accordingly, even a defendant who discriminates while intending to cause injury might escape liability for punitive damages under § 1981 if he thought his conduct was lawful. This informs our remark that punitive damages are "an extraordinary remedy" and "not every lawsuit under section 1981 calls for submission of this extraordinary remedy to a jury." Stephens v. S. Atl. Canners, Inc., 848 F.2d 484, 489-90 (4th Cir. 1988).

Soon after Kolstad, we reviewed a § 1981 punitive-damages award in Lowery. Renee Lowery and Lisa Peterson alleged that Circuit City Stores, Inc. ("Circuit City") failed to promote them because of racial animus. Circuit City was found liable under Title VII and § 1981, and the jury awarded punitive damages of $225,000. On appeal, Circuit City asserted that the record did not support punitive damages. Notably, we found

31

punitive damages recoverable only under § 1981 and limited our analysis accordingly.  Lowery, 206 F.3d at 441.

We explained, "Kolstad teaches that we . . . must first ask whether the record contains sufficient evidence for a reasonable juror to find that in intentionally refusing to promote the plaintiff . . . the decision maker did so in the face of a perceived risk that her decision would violate federal law." Id. at 443.  We continued, "If the answer is no, we should vacate the portion of the judgment awarding the plaintiff punitive damages and direct entry of judgment as a matter of law in favor of Circuit City on that issue."  Id.  In the end, we found that the record did contain sufficient evidence because Circuit City had presented "evidence that it required every person in management to attend a week-long training seminar that included education on the federal anti-discrimination laws." Id. (citing E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999) (finding sufficient evidence where the offending manager "testified that he was familiar with the accommodation requirements of the ADA and its prohibition against discrimination and retaliation in the workplace")).

We considered the same legal issue in subsequent cases. Sufficient evidence was found where a supervisor who engaged in sexual harassment "testified that he had seen an EEOC poster regarding sexual harassment" at work that read, "Sexual

32

harassment is unlawful and unacceptable in the workplace." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002). Although the supervisor denied reading the poster, we found that "a reasonable jury could nevertheless infer that [his] awareness of the poster suggested at least a rudimentary knowledge of its import." *Id.* Sufficient evidence was also found where a manager "was specifically aware of FedEx's internal ADA compliance policy, and had received training from FedEx on the ADA's compliance requirements." *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 373 (4th Cir. 2008).

By contrast, we declined to find sufficient evidence in *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325 (4th Cir. 2003) (en banc). Lisa Ocheltree sued her employer Scollon Productions, Inc., under Title VII because she "was the victim of severe or pervasive sex-based harassment in her workplace." *Id.* at 327. We "combed the record," however, and found "no evidence that would allow a jury to find that Scollon Productions knew, either directly or by imputation, that it might have been acting in violation of Ocheltree's 'federally protected rights.'" *Id.* at 336. Thus, we upheld the verdict on liability but vacated punitive damages. *Id.*

The case before us presents a scenario comparable to *Ocheltree*. WWNS has been unable to cite any evidence that DynCorp terminated the CivPol Subcontract "in the face of a

33

perceived risk that [its] decision would violate federal law."[11] Lowery, 206 F.3d at 443. The district court likewise failed to cite such evidence, and we could find none upon combing the record.[12] Accordingly, we conclude that the award of punitive damages should be vacated.[13]

---

[11] WWNS cites only 41 C.F.R. § 60-1.4, which requires government contractors to adopt contractual language that pertains to discrimination against employees or applicants for employment under Title VII. However, the language nowhere mentions discrimination against minority-owned corporate subcontractors under § 1981.

[12] Judge Jones's opinion, dissenting in part, states that WWNS's July 26, 2006, letter to DynCorp indicates that DynCorp was warned about WWNS's federal right under § 1981. The letter itself, however, shows that this warning came after DynCorp had already terminated the CivPol Subcontract. The letter demands that DynCorp "comply with its obligations under the terms of the February 16, 2004, Subcontract and related Task Orders (collectively 'the Agreements')," but makes clear that DynCorp had already repudiated them. The letter states that "DynCorp has taken it upon itself to inform . . . WWNS employees . . . that the Agreements have been terminated," and that WWNS "consider[ed] DynCorp's conduct to constitute . . . a material breach of the Agreements." J.A. 2692. Because WWNS sent the letter after DynCorp had already terminated the CivPol Subcontract, the letter tells nothing about whether DynCorp previously acted "in the face of a perceived risk that [its] decision would violate federal law." Lowery, 206 F.3d at 443.

[13] Added to our rationale, DynCorp argues that the legal theory WWNS advanced was "novel or otherwise poorly recognized," Kolstad, 527 U.S. at 537, because whether a corporation may sue under § 1981 was never crystal clear. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 473 n.1 (2006) (noting that "we have no occasion to determine whether, as a corporation, it could have brought suit under § 1981" (emphasis omitted)); Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 263 (1977) (holding that "a corporation . . . has no racial (Continued)

34

2.

Even aside from the above error, the award of punitive damages could not stand because the district court's jury instruction on punitive damages was also erroneous. "Instructions are adequate if construed as a whole, and in light of the whole record, they adequately inform the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 530 (4th Cir. 2002) (internal quotations omitted). "Even if instructions are flawed, there can be no reversal unless the error seriously prejudiced the challenging party's case." Id. (internal quotations omitted). Because DynCorp's objection to the district court's instruction on punitive damages was not preserved according to Federal Rule of Civil Procedure 51(d)(1), reversal would be proper "only when we can conclude that [the] particular jury instruction must necessarily have caused the jury to act in complete ignorance of, or to have misapplied, fundamentally controlling legal principles to the inevitable prejudice of an aggrieved party." Spell v. McDaniel, 824 F.2d 1380, 1399 (4th Cir. 1987); see also Fed. R. Civ. P. 51(d)(2).

---

identity and cannot be the direct target of . . . discrimination").

35

In this case, the district court gave the following instruction: "[Y]ou may award punitive damages if WWNS . . . [has] shown by clear and convincing evidence that DynCorp maliciously, or with reckless indifference, discriminated against WWNS." J.A. 1771. Notably, the court never defined "malice" or specified to what "reckless indifference" refers. The word "malice" ordinarily means: "A desire to harm others or to see others suffer; extreme ill will or spite." American Heritage Dictionary of the English Language 1059 (4th ed. 2006). Unless properly instructed, a layperson would not know that "malice" also has a technical legal meaning relating to awareness that one may be breaking the law. Cf. Perry v. McCaughtry, 308 F.3d 682, 694 (7th Cir. 2002) (Posner, J., dissenting) (arguing that a layperson would not without instruction know that "cause" had the technical meaning "substantial factor in"). Nor would a layperson assume that "reckless indifference" in the instruction specifically means "reckless indifference to federally protected rights." Accordingly, the jury could not have known that "'malice' or 'reckless indifference' pertain to [DynCorp's] knowledge that it may be acting in violation of federal law," Kolstad, 527 U.S. at 535, or that punitive damages are improper unless DynCorp acted "in the face of a perceived risk that [its] decision would violate federal law," Lowery, 206 F.3d at 443. Therefore, we

36

believe the challenged instruction "caused the jury to act in complete ignorance of . . . fundamentally controlling legal principles."  Spell, 824 F.2d at 1399.

Regarding whether DynCorp was prejudiced by the instruction, we note again that WWNS has not identified any evidence that DynCorp suspected that terminating the CivPol Subcontract might violate federal law, and we found no such evidence in the record.  Notwithstanding, the jury awarded $10 million of punitive damages, which the district court concluded was "for DynCorp's Section 1981 violation."  J.A. 1911.  Therefore, we believe serious prejudice necessarily resulted from the challenged instruction.

3.

Although the punitive-damages award based on the § 1981 claim should be vacated, the jury's verdict complicates our disposition.  The district court instructed that punitive damages may be awarded on Counts 1 and 3-5.  Among this group, DynCorp was found liable only on Count 1 (§ 1981 discrimination) and Count 3 (tortious interference with contract).  The jury awarded $10 million of punitive damages, but the verdict does not specify how much was allocable to Count 1 rather than Count 3.  For this reason, we cannot vacate the award without unwittingly vacating any punitive damages allocable to Count 3.

37

Accordingly, the case must be remanded for retrial on punitive damages for Count 3.[14]


                            III.

     For the reasons stated above, we affirm the district court's refusal to give DynCorp's proposed jury instruction pertaining to <u>Hill</u>, the court's denial of DynCorp's Rule 50(b) motion regarding the § 1981 claim, and all evidentiary rulings challenged by DynCorp.  However, we reverse the court's denial of DynCorp's Rule 50(b) motion regarding WWNS's prayer for punitive damages based on the § 1981 claim, vacate the award of punitive damages, and remand the case for retrial on punitive damages for Count 3.  Accordingly, we

                              <u>AFFIRM IN PART AND REVERSE IN PART</u>.

---

[14] Any reconsideration should take into account the standard for awarding punitive damages under Virginia law.

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

After DynCorp International, LLC refused to renew its subcontract with Worldwide Network Services, LLC for information-technology services, Worldwide Services commenced this action, alleging that DynCorp's termination of the subcontract was motivated by racial animus and thus constituted racial discrimination in contracting, in violation of 42 U.S.C. § 1981. The subcontract had been entered into to assist DynCorp's performance of its contract with the State Department to support civilian police programs in Iraq and Afghanistan.

DynCorp maintained that it terminated its relationship with Worldwide Services because of Worldwide Services' poor performance and that the conceded racial animus of a mid-level manager, who lacked authority to end the relationship, was not imputable to the corporation under Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (holding that an employer will not be liable under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act of 1967 ("ADEA") "for the improperly motivated person who merely influences the decision, but [only] for the person[s] who in reality make[] the decision" (emphasis added)). The district court refused DynCorp's request to apply Hill to this case and declined to give an instruction

39

to the jury that would have barred imputation of the mid-level manager's racial animus to the corporation for purposes of determining liability under § 1981. The court stated, "[T]he jury doesn't have to specify which person did what." The jury was thus allowed to consider the racial animus of individuals, including the mid-level manager, who may have influenced those who made the decision on behalf of DynCorp, but who were not themselves decisionmakers, in violation of Hill.

The majority approves this error by concluding that Hill does not apply to this case because some of the other DynCorp employees alleged to have acted with racial animus were high-level executives who may have had authority to decide not to renew Worldwide Services' subcontract, whereas Hill applies when the plaintiff's claim "rests . . . upon the discriminatory motivations of a subordinate employee." Hill, 354 F.3d at 291. What this reasoning overlooks, I respectfully submit, is the extent to which Worldwide Services' claim was based on the conceded racial animus of the mid-level manager, who clearly lacked authority to end the relationship between the two companies, but who was in a position to influence the decision to such an extent that the jury may have found that his racial bias was "a motivating factor in DynCorp's decision," which was all the district court required the jury to find before imposing liability on the corporation. Because Worldwide Services

presented considerable evidence of this mid-level manager's racial bias and his role in the deterioration of the companies' relationship, the jury needed to be told that only the racial animus of DynCorp's actual decisionmakers could be considered in determining whether race motivated the corporation's decision.

Because Hill applies to determine when the racial animus of an employee is imputable to a corporation, it was error for the district court to have refused to give an instruction under Hill. And because, in this case, the mid-level manager with racial animus may, as a factual matter, have substantially influenced the decision not to renew Worldwide Services' subcontract, the error was prejudicial. Accordingly, I believe that a new trial is necessary to permit the jury to resolve who DynCorp's decisionmaker or decisionmakers were and whether they were actually motivated by racial animus in deciding not to renew Worldwide Services' subcontract. Because I would grant DynCorp's request for a new trial, I would not reach the other issues addressed by the majority, with one exception. In view of the majority's determination to affirm on liability and to provide Judge Duncan with a majority on her discussion of punitive damages, I join her discussion of punitive damages, as contained in Parts II(D)(1) and (2).

41

I.

In February 2004, the ITS (International Technical Services) Division of DynCorp won a contract from the State Department to provide support for civilian police ("CIVPOL") programs in Iraq and Afghanistan. Thereafter, DynCorp awarded a subcontract to Worldwide Services to perform communication and information-technology services for the CIVPOL program pursuant to "task orders" issued by DynCorp. The subcontract's term extended one year (February 2004 to February 2005) and was renewable under four one-year options. DynCorp renewed the subcontract in February 2005 and again in February 2006, but not thereafter.

Worldwide Services was headed by Walter Gray and Reginald Bailey, both African Americans, and the company was certified by the Small Business Administration as a Section 8(a) disadvantaged company. Before its subcontract with DynCorp, Worldwide Services' annual revenue was about $100,000, which was produced primarily by providing information-technology services to local businesses. During the first year of its subcontract with DynCorp, however, Worldwide Services received over $20 million in revenues.

Richard Cashon, a DynCorp vice president and its program manager for the CIVPOL program, was charged with formally evaluating Worldwide Services' performance under the

42

subcontract, and he gave it positive marks. In January 2006, Cashon rated Worldwide Services' performance as "exceptional" and "very good," noting Worldwide Services' "technical depth in terms of the number of technically competent individuals on their staff" and "flexib[ility] in terms of operating in a dynamic environment." Cashon wrote that he would have no reservations about using Worldwide Services in the future. A few months later, Cashon again rated Worldwide Services' work as "good" or "excellent" in every category and again stated that DynCorp "[w]ould . . . hire this contractor again."

Despite Cashon's positive evaluations, in early 2006 DynCorp received two letters from the State Department criticizing both DynCorp and Worldwide Services' performance. In the first letter, the Principal Deputy Assistant Secretary for the State Department's Bureau of International Narcotics and Law Enforcement Affairs wrote a letter to DynCorp's CEO to complain about a number of defects in DynCorp's performance, including its supervision of Worldwide Services. The letter stated that "[Worldwide Services'] technical performance has in general been inadequate to the point where it has disrupted critical communications in the field." The letter also made clear that DynCorp's relationship with the State Department could be jeopardized if the problems were not resolved.

43

About three weeks later, a State Department representative in Baghdad sent a second letter to DynCorp that focused exclusively on the services provided by Worldwide Services in Iraq, and this letter was even more critical of Worldwide Services' performance.  It concluded that "[a] great deal must be accomplished to improve many aspects of [Worldwide Services'] service provision, levels of expertise, project management and implementation strategies to effect acceptable standards of IT/communications support."

After receiving these letters, DynCorp developed a plan to manage Worldwide Services more actively.  Bob Rosenkranz, the President of DynCorp's ITS Division, designated Richard Walsh, the Vice President for Operations, to serve as a "mentor" to help Worldwide Services improve its performance.  Walsh began by having weekly meetings with Worldwide Services' executives Gray and Bailey, and in the first meeting Walsh emphasized that Worldwide Services was "in danger of losing [DynCorp's] business altogether" if its performance did not improve.  In February 2006, Walsh traveled to Afghanistan to observe Worldwide Services' performance on the ground and, as Walsh later testified, he found "[t]he situation . . . much worse than I had thought" and observed that "the basics were not being taken care of."  Walsh was particularly concerned that those traveling into hostile areas were at greater risk because the high-frequency

44

radio network, for which Worldwide Services had responsibility, was not working properly.

When Walsh shared his observations with Rosenkranz, Rosenkranz expressed hope that DynCorp could still "whip [Worldwide Services] into shape." Rosenkranz also described Worldwide Services as "one of the favored ones," suggesting that he shared Walsh's view that Worldwide Services received "protection" from Steve Cannon, DynCorp's CEO and the DynCorp executive most responsible for DynCorp's relationship with Worldwide Services.

In addition to Walsh's efforts, DynCorp also conducted internal investigations into Worldwide Services' performance in both Iraq and Afghanistan, and DynCorp's management received separate reports from these investigations. The report from Iraq, completed by June 19, 2006, noted that the "concern regarding the status of IT and the [Worldwide Services] team that provides that service to [DynCorp] is well-founded." But it also noted that "recent efforts by the [Worldwide Services] team to improve the situation are typically reaching positive results" and that "[t]he current situation is a contrast from what is typically perceived as a rather negative history." The report from Afghanistan, completed between July 22-31, 2006, found that "the CIVPOL Afghanistan program suffers from a

45

serious IT and [c]ommunications problem that is resulting in reduced program efficiency and effectiveness."

DynCorp's relationship with Worldwide Services suffered an additional serious blow when DynCorp received a third letter from the State Department -- this time from the contracting officer overseeing the CIVPOL contract -- complaining about Worldwide Services' performance. This letter, dated June 23, 2006, emphasized the State Department's "concern[s] about pervasive information technology (IT) performance deficiencies on all DynCorp Task Orders." After describing a number of specific issues, the letter concluded by requesting a meeting "to discuss this broad spectrum of information technology deficiencies," noting that "[t]he varied nature of these problems and their pervasiveness suggests that they are systemic." Shortly after DynCorp received this letter, its Board of Directors held a meeting, at which Cannon was questioned about the State Department's complaints. Cannon responded that "it might become necessary to replace the subcontractor in question." Four days later, however, Cannon resigned as President and CEO of DynCorp.

Cashon, the program manager, then decided not to issue any additional CIVPOL task orders to Worldwide Services in Iraq. While it was typical for the program manager to make such decisions, in this case there was evidence that Rosenkranz and

Walsh participated in the decision. During the last week of July, Cashon also decided to allow all remaining CIVPOL task orders directed to Worldwide Services to expire and not to renew DynCorp's subcontract with Worldwide Services.

Worldwide Services commenced this action alleging, among other things, that DynCorp's decision not to issue further task orders and not to renew its CIVPOL subcontract was the product of intentional racial discrimination, in violation of 42 U.S.C. § 1981. At trial, Worldwide Services presented five items of direct evidence to demonstrate racial animus.

First, Charles Jones, Worldwide Services' Deputy Program Manager in Iraq from March 2006 to August 2006, testified about racially offensive statements made by Leon DeBeer, DynCorp's Iraq IT Manager and the DynCorp employee to whom Worldwide Services' employees reported in Iraq. Specifically, Jones testified that in private conversations, DeBeer, a white South African, regularly referred to Worldwide Services' Walter Gray as a "nigger," a "bush native," and a "kaffir." He also testified that DeBeer regularly complained that white people "had made a grave error" by "tak[ing] the black man as a youth and attempt[ing] to clothe him and send him to school" because "the proper role of the black man was to go out and kill a lion, proving his manhood, at which point in time he should be put to work to feed his family" and "be mated with a woman so that he

47

would have more children, who could then be put to work feeding the family."

Second, Jones testified that while he was in Iraq, he heard Mike Kehoe, DynCorp's Deputy Program Manager in Iraq for another State Department contract, describe the acronym for Worldwide Network Services, "WWNS," as standing for "where white men never stay."

Third, John Mack, a part owner of Worldwide Services, testified that he once heard Walsh refer to Gray as "a stupid black mother --."

Fourth, Richard Spencer, a former DynCorp executive in the ITS Division who is Hispanic, testified about the lack of racial diversity among DynCorp's ITS executives and about his belief that his ethnicity played a role in the termination of his own employment.[*]

---

[*] The majority attributes Spencer's termination to Rosenkranz and repeatedly refers to it as evidence of Rosenkranz's racial animus. But Spencer testified that while Rosenkranz signed his termination letter, Spencer had a "fairly good" relationship with Rosenkranz, who is "not a bad guy." Spencer instead suggested that his termination was the decision of Herb Lanese, DynCorp's CEO at the time, who did not like Spencer "for whatever reason." Moreover, Spencer did not attribute any racial motivation to Rosenkranz in signing the letter. Considered in its full context, Spencer's testimony about his termination should not be used to impute racial animus to Rosenkranz.

Finally, Spencer also testified about a dinner he attended in October 2006 for all of Rosenkranz's direct subordinates and their guests -- approximately 40 persons -- at which Bill Cavanaugh, DynCorp's Vice President for Business Development, presented Walsh with a shirt that said, "WWNS -- I took them down, and all I got was this lousy T-shirt." Cavanaugh then proceeded to read a series of fictitious letters, the last of which purported to be from Gray. According to Spencer, Cavanaugh read the letter, "mak[ing] a bad impression of Walter" by talking like "the character on Fat Albert" and using "his interpretation of Ebonics." Spencer testified that everybody laughed and that specifically Rosenkranz "was laughing his ass off" and Walsh was "laughing, happy."

Recognizing that the evidence most strongly described racial animus of DeBeer, DynCorp requested a jury instruction from the district court, based on Hill, limiting those employees whose racial animus would be imputable to the corporation. Its requested instruction provided in part:

> To the extent that [Worldwide Services] rests its discrimination claim upon the discriminatory motivations of a subordinate employee, [Worldwide Services] must show by the greater weight of the evidence that the subordinate employee possessed such authority to be viewed as the one principally responsible for the decision or the actual decisionmaker for DynCorp.

49

The district court refused to give the instruction, justifying its refusal by making a distinction between this case and Hill. The court noted that the Hill opinion was limited to employer liability under Title VII and the ADEA, whereas this case involves liability under § 1981. The court stated, "Plaintiffs pursuing claims under Title VII or the ADEA are subject to stricter scrutiny than those pursuing claims under Section 1981 because Title VII and ADEA actions must first proceed through the EEOC process." The court noted that our decision in Hill has "never been extended beyond claims brought under Title VII and the ADEA," and it "decline[d] to be the first court to expressly do so." The court concluded that "the Hill standard is not a correct statement of law for claims brought under 42 U.S.C. § 1981."

Rather than limit DynCorp's discrimination liability under § 1981 to the standard stated in Hill, the district court instructed the jury that the "race of [Worldwide Services'] owners . . . must have been a factor that actually led to the decision . . . not to renew or extend [Worldwide Services'] CIVPOL subcontract or task orders." (Emphasis added).

The jury found that DynCorp's decision not to renew or extend Worldwide Services' CIVPOL subcontract or task orders was based in part on racial animus imputed to the corporation, and it returned a verdict in favor of Worldwide Services on its

50

§ 1981 claim, awarding it $3.42 million in compensatory damages and $10 million in punitive damages. From the judgment entered on the jury's verdict, DynCorp filed this appeal.

## II.

DynCorp's decision not to renew its subcontract with Worldwide Services was a corporate decision, and the corporation's management testified that the corporate decision was made by executives whose motive for ending the relationship with Worldwide Services was only business oriented -- based on Worldwide Services' poor performance, as graphically demonstrated by the three letters of complaint from the State Department -- and not for any reason of race.

Worldwide Services alleges that race was a motivating factor, and the vast bulk of its direct evidence of racial animus bore on DeBeer, the IT Manager in Iraq.

As a middle manager, DeBeer's views about Worldwide Services' performance were influential in that Cashon listened to executives both below and above him. But DeBeer was not the decisionmaker or even one of several possible decisionmakers. Everyone at DynCorp testified that the person who had the authority to make the decision not to renew Worldwide Services' subcontract was Cashon, the manager for the CIVPOL program, who concededly did not have any racial animus toward Worldwide

51

Services. Indeed, he was a strong supporter of the firm until evidence started coming in about its deficiencies. There was also testimony that two other DynCorp executives, Rosenkranz and Walsh, participated in the decision. While there was some evidence of racial animus imputable to them, it was much weaker and more isolated than that imputed to DeBeer. Specifically, testimony showed that Rosenkranz and Walsh laughed at racial jokes directed at Worldwide Services told at a dinner and that Walsh once make a racial slur about Worldwide Services' Walter Gray.

In short, without the racial animus of DeBeer, no one can predict how the jury might have ruled. The record amply supports DynCorp's suggestion that, absent DeBeer's racial animus, the evidence may have been too weak as a matter of law to support a § 1981 claim and that therefore DeBeer's racial animus was critical. Because the district court allowed DeBeer's racial animus to be considered by the jury in deciding whether DynCorp's decision was racially motivated, it is a real possibility that it allowed the jury to find § 1981 liability erroneously. This is because DeBeer, as the subordinate of Cashon, had influence on Cashon's decision on behalf of DynCorp. Without testimony of DeBeer's racial animus, the jury was essentially left with direct evidence that Rosenkranz and Walsh

laughed at racial jokes about Worldwide Services and Walsh once spoke a racial slur about Gray.

Thus, it was likely critical to the jury's verdict whether DeBeer's racial animus could be imputed to DynCorp as a motivating factor in its not renewing Worldwide Services' subcontract. Had the district court applied Hill, the jury would have been told that DynCorp was not "liable . . . for the improperly motivated person [DeBeer] who merely influences the decision." Hill, 354 F.3d at 291. We explained in Hill that an employee, such as DeBeer, does not become a decisionmaker whose discriminatory motivations may be attributed to the employer "simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision." Id. (emphasis added). If Hill had been applied, the jury would have been told that Worldwide Services had to prove that DeBeer "possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer" before it could consider the impact of DeBeer's racial animus. Id. (emphasis added). Based on the testimony in this record that Cashon made the decision with Rosenkranz and Walsh and that DeBeer did not have the authority of one principally responsible for the decision but could only be tagged as one having

influence on it, DeBeer's racial animus would not have been imputable to DynCorp.

In limiting a corporation's liability for racial discrimination in Hill to the conduct of persons actually responsible for the corporation's action, we carried out Congress' intent to hold a corporation responsible for racial discrimination only when its executives and employees responsible for the corporation's decision acted with racial animus, not when any corporate employee manifested racial animus.

The district court, however, rejected the application of Hill to § 1981 and instead instructed the jury that the race of Worldwide Services' owners "must have been a factor that actually led to the decision" to terminate DynCorp's relationship with Worldwide Services. As a result, the jury was permitted to consider the racial animus of any employee whose influence "actually led to the decision." The district court thus extended corporate liability for § 1981 to the actions of any person who influenced the decision, regardless of whether that person was a decisionmaker. If Hill was applicable, the district court's instruction was legally erroneous.

Not only was the district court's instruction erroneous under Hill, if Hill was applicable, the error was material to the outcome in this case. Without consideration of DeBeer's

54

racial animus, the evidence to support a verdict was thin, perhaps even fatally thin, and the district court surely recognized this. It devoted substantial discussion to why it decided not to give the Hill instruction, concluding that Hill was "not a correct statement" of § 1981 law and that corporate agency for discrimination under Title VII was "subject to stricter scrutiny" than corporate agency under § 1981. Indeed, the court acknowledged the importance of Hill when it stated that it "adopted whole cloth DynCorp's proffered Section 1981 jury instructions, excluding only the language specifically addressing Hill's holding." (Emphasis added).

The dispositive question on appeal, therefore, reduces to whether Hill accurately describes when the racial animus of corporate employees may be imputed to a corporation for purposes of the corporation's liability for racial discrimination under § 1981. I submit that how racial animus is imputed to a corporation for corporate liability is the same issue, whether discrimination is alleged to be in violation of Title VII or of § 1981, as we have so recognized. Indeed, the majority, too, assumes that Hill applies to § 1981 claims. This assumption is, I believe, correct and determinative of this appeal.

55

III.

In Hill, a former Lockheed mechanic, whose employment was terminated on the basis of three written reprimands, brought an action against her corporate employer under Title VII and the ADEA, alleging that her team's safety inspector's discriminatory animus led him "to report admittedly valid infractions," resulting in her second and third reprimands. Hill, 354 F.3d at 283. Hill's claim therefore rested on her argument that the safety inspector's alleged discriminatory animus should be imputed to the corporation. Hill did not dispute that she had violated corporate rules and standards, and she did not assert that her direct supervisors, who issued the reprimands, or her two program managers, who terminated her employment, acted with discriminatory animus. The district court granted Lockheed's motion for summary judgment, and we affirmed. We held that Hill could not base a claim on the safety inspector's animus because he was not one of the corporation's decisionmakers with respect to the decision to issue reprimands to Hill or to terminate her employment.

In reaching this result, we held that "an employer will be liable not for the improperly motivated person who merely influences the decision [to take an adverse employment action], but for the person who in reality makes the decision." Hill, 354 F.3d at 291 (emphasis added). To be sure, we did not limit

56

corporate liability under Title VII and the ADEA to the actions of only "formal decisionmakers for the employer," because doing so might allow employers "to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." Id. at 290 (emphasis added). But we also rejected the notion that the discriminatory motivations of an employee may be attributed to the employer "simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision." Id. at 291. Thus, we concluded that in determining a corporation's liability under Title VII or the ADEA, the focus must be on the motivations of those agents of the corporation who actually made the adverse employment decision on behalf of the corporation:

> In sum, to survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.

Id.

Even though Hill defined corporate liability under only Title VII and the ADEA, the agency issue resolved in Hill exists under any discrimination statute creating corporate liability. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754

57

(1998).  More to the point, in § 1981 claims, courts must answer the same "general question [of] the proper extent of a[] [corporate] employer's responsibility for the offensive acts of its employees."  Dennis v. County of Fairfax, 55 F.3d 151, 155 (4th Cir. 1995).  And Congress, in drafting § 1981, need not have provided an explicit direction to be clear that this question "implicates principles of agency law."  Id. at 155. Indeed, we have previously recognized that the same general agency principles apply in interpreting § 1981 as apply in interpreting Title VII.  See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184, 186-90 (4th Cir. 2001) (noting that under both § 1981 and Title VII there must be "some basis for imposing liability on [the corporate defendant]" and analyzing the employer's liability for a racially hostile work environment without distinguishing between the two statutes (internal quotation marks and citation omitted)); Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 441 (4th Cir. 2000) (using the Title VII standard for imputing liability to a corporate employer for conduct alleged to justify punitive damages under § 1981).

Moreover, it would be analytically discordant not to apply Title VII agency principles to § 1981 agency questions.  An employee alleging that his corporate employer intentionally discriminated against him on the basis of race, in violation of both Title VII and § 1981, would oddly be able to demonstrate

58

his employer's liability under § 1981 for the discriminatory motivations of an employee who substantially influenced, but did not make, the decision to take an adverse employment action against him, but he would not be able to do so under Title VII. Similarly, an employee alleging intentional discrimination on the basis of sex or religion premised on a subordinate employee's influential animus would have no recourse, while her coworker's analogous § 1981 claim would succeed. While we must recognize that Title VII and § 1981 provide "separate, distinct, and independent" causes of action, Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 461 (1975), the standard for imputing racial animus to a corporation in making out each claim must, out of logical and practical necessity, be the same.

Worldwide Services argues bluntly that Hill should not be expanded because it was erroneously decided, relying on decisions in other circuits that have criticized Hill. See Poland v. Chertoff, 494 F.3d 1174, 1182-83 (9th Cir. 2007) (finding Hill's rule too narrow and holding instead that "even if the biased subordinate was not the principal decisionmaker, the biased subordinate's [improper] motive will be imputed to the employer if the subordinate influenced, affected, or was involved in the adverse employment decision"); EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 487 (10th Cir. 2006) (critiquing Hill's "peculiar focus on who is a decisionmaker for

purposes of discrimination actions" on the ground that, under agency law principles, an employer's agents "include[] not only 'decisionmakers' but other agents whose actions, aided by the agency relation, cause injury" (internal quotation marks and citation omitted)); Lust v. Sealy, Inc., 383 F.3d 580, 584 (7th Cir. 2004) (criticizing Hill as "inconsistent with the normal analysis of causal issues in tort litigation"); cf. Ricci v. DeStefano, 129 S. Ct. 2658, 2689 (2009) (Alito, J., concurring) (noting circuit split and describing Hill as adopting "[t]he least employee-friendly standard" by "ask[ing] only whether 'the actual decisionmaker' acted with discriminatory intent"). But, it would be inappropriate for us to limit Hill arbitrarily, which is precisely what we would have to do in order to conclude that the agency principles announced in Hill do not apply to § 1981 actions. Worldwide Services' argument that Hill was wrongly decided can only be directed to this court sitting en banc.

In sum, the issue of when to impute the racial animus of an employee to a corporation for liability under Title VII and § 1981 must be and, indeed, is the same. See Spriggs, 242 F.3d at 184, 186-90; Lowery, 206 F.3d at 441. It was thus prejudicial error for the district court to have concluded that the standard was different and to have refused to instruct the jury on the Hill standard for determining whether the racial

60

animus of DeBeer was imputable to DynCorp in connection with DynCorp's decision not to renew the subcontract with Worldwide Services. Because a new trial on Worldwide Services' § 1981 claim is thus required, I would vacate the judgment on the § 1981 claim, including the award of punitive damages, and remand for a new trial, requiring the district court to instruct the jury on Hill.

JONES, Chief District Judge, concurring in part and dissenting in part:

I join with Judge Duncan in affirming the district court's refusal to instruct the jury based on Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277 (4th Cir. 2004), its denial of a Rule 50(b) motion on the plaintiff's § 1981 claim, and its evidentiary rulings.  However, I would also affirm the district court's refusal to set aside the jury's punitive damage award.[1]

The majority finds that there was insufficient evidence to support an award of punitive damages as to the § 1981 claim.  To the contrary, I believe that there was ample evidence that DynCorp International, LLC ("DynCorp") terminated the subcontract it entered into with Worldwide Network Services, Inc. ("WWNS") to provide communication and information-technology services for the U.S. State Department's Civilian Police programs in Iraq and Afghanistan ("CivPol Subcontract")

---

[1] The result of the majority holding in this appeal is to remand the case for a new trial solely on to the issue of punitive damages as to Count 3, tortious interference with contract. Punitive damages on that count will be capped by state law at $350,000.  Va. Code Ann. § 8.01-38.1 (2007).  Under Judge Niemeyer's view of the case, the case would be remanded for a new trial as to both liability and damages on the § 1981 claim. Because there is no statutory cap on § 1981 punitives, this result would preserve the possibility of a larger punitive damage award –- perhaps as much as $10 million, as awarded by this jury.  If WWNS had its option, it might prefer Judge Niemeyer's result, but of course we do not decide legal issues on the basis of the parties' preferences.

in the face of knowledge that "it may be acting in violation of federal law." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999).

Indeed, DynCorp was warned by WWNS that ending the CivPol Subcontract might violate WWNS's federally protected rights. On July 26, 2006, WWNS sent DynCorp's in-house counsel a letter, via e-mail and overnight mail, demanding that DynCorp immediately "comply with its obligations under the" CivPol Subcontract and informing DynCorp that WWNS had "evidence that DynCorp's actions have been racially-motivated in violation of federal anti-discrimination laws." (J.A. 2692.) The evidence also shows that the executives who made the decision to terminate the CivPol Subcontract were aware of the contents of this letter. On July 26, 2006, WWNS Chairman and CEO, Walter Gray, wrote two of DynCorp's decisionmakers, Richard Cashon and Robert Rosenkranz -- as well as Herb Lanese, the CEO of DynCorp -- to confirm that DynCorp's in-house counsel received the letter "regarding [DynCorp's] wrongful and improper conduct in terminating [WWNS's] services under the CivPol subcontract." (J.A. 2694.) Richard Walsh, Division Vice-President of Operations for DynCorp, later e-mailed an internal PowerPoint presentation to other DynCorp executives including Cashon, outlining the eventual termination of the CivPol Subcontract. One of the slides of the presentation stated that "[r]ecent

63

correspondence indicate[s] that WWNS is planning legal action against [DynCorp] based on racial discrimination." (J.A. 2788.)

Comparing this case to Anderson v. G.D.C., Inc., 281 F.3d 452 (4th Cir. 2002), it is clear a jury could reasonably conclude from the July 26 letter that DynCorp's decisionmakers discriminated against WWNS "in the face of a perceived risk that its actions will violate federal law." Kolstad, 527 U.S. at 536. In Anderson, one of the defendant's employees was found to have sexually harassed the plaintiff in violation of Title VII, a federal law prohibiting discrimination on the basis of sex. 281 F.3d at 458-59. The only evidence presented that the employee knew of the Title VII prohibition was that he looked at, but did not read, a poster entitled "Sexual Harassment," advising employees of proper workplace conduct. Id. at 460. Nevertheless, this court found that the employee's mere "awareness" of the poster "suggested at least a rudimentary knowledge of its import" sufficient to pass the Kolstad test. Id.

Here, the DynCorp decisionmakers were directly warned, and even anticipating, that they would have to confront litigation for racial discrimination if they continued to pursue the termination of the CivPol Subcontract. Their level of awareness of WWNS's federally protected rights was therefore well beyond

64

that of the employee in <u>Anderson</u> who at most saw the title of a poster on a wall.

DynCorp argues that, even if the July 26 letter did put the decisionmakers on notice, it came too late to avoid violating § 1981, but I find little merit to this argument. The letter was sent well before WWNS had ceased operations under the CivPol Subcontract in either Iraq or Afghanistan. Not only were the task orders under the CivPol Subcontract still in effect, but DynCorp had not yet notified WWNS of its intention to let any of the task orders expire.

The task order in Iraq was not scheduled to end until August 11, 2006. Although DynCorp formally informed WWNS in a letter dated July 28, 2006, that DynCorp intended to let the personnel portion of this task order expire, DynCorp also extended its purchase of services from WWNS in Iraq another thirty days.

Moreover, the four task orders in Afghanistan continued until August 31, September 8, September 30, and October 9, 2006, months after WWNS's warning. According to the CivPol Program Manager Richard Cashon, "The task orders in Afghanistan had a little bit more time on them . . . . It could have been conceivable to continue with WWNS in Afghanistan, if the situation dictated it, even though we were transitioning out of Iraq." (J.A. 1678.) According to DynCorp's own PowerPoint

65

presentation, the "[f]inal transition" from WWNS was not set to occur until October 9, 2006. (J.A. 2791.) Thus, even if, by July 26, 2006, DynCorp's decisionmakers were already scheming to terminate the CivPol Subcontract, they still had plenty of time to reverse their decision in order to avoid violating § 1981.

Accordingly, I find that there was sufficient evidence that DynCorp was aware that its actions might violate WWNS's federally protected rights,[2] and I would not vacate the punitive damage award on this ground.

In addition, because DynCorp did not properly object to the district court's punitive damage instruction to the jury, and because the instruction given did not prejudice DynCorp, I would not vacate the award on that ground.

Finally, the amount of the punitive damage award does not violate due process, as argued by DynCorp, and is not assailable for that reason. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (holding that a single digit ratio, especially four to one or less, between punitive and compensatory damages is "likely to comport with due process").

---

[2] It is true, as Judge Duncan points out, that in affirming the punitive damage award, the district court did not cite any evidence that DynCorp had knowledge that it might violate § 1981. However, DynCorp never claimed below that it lacked knowledge of WWNS's federally protected rights.

66

For these reasons, while I otherwise agree with Judge Duncan, I respectfully dissent from setting aside the jury's punitive damage award.